UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JOSE RODRIGUEZ,<br><br>Defendant. | 4:22-CR-40106-KES<br><br>REPORT AND RECOMMENDATION |

## INTRODUCTION

Defendant Jose Rodriguez is before the court on an indictment charging him with possession of a firearm by a prohibited person. See Docket No. 1. Mr. Rodriguez has filed a motion to suppress certain evidence. See Docket No. 33. The United States ("government") resists the motion. See Docket No. 36. The matter has been referred to this magistrate judge for holding an evidentiary hearing and recommending a disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and DSD LR 57.11 (Crim.).

## FACTS

An evidentiary hearing was held on March 28, 2024. Mr. Rodriguez was present in person along with his lawyer, Assistant Federal Public Defender Hannah Moravec. The government was represented by its Assistant United States Attorney, Paige Peterson. One witness testified and five exhibits were

received into evidence. From this testimony and these exhibits, the court makes the following findings of fact.

On the afternoon of August 2, 2021, a few days before the start of the annual Sturgis Motorcycle Rally,[1] South Dakota Highway Patrol Trooper Nathan Monger was on duty in the city of Mitchell, South Dakota. Shortly before 4:00 p.m., Trooper Monger had pulled into a parking lot near the intersection of West Havens Avenue and South Ohlman Street to take a phone call.

The court takes judicial notice of the following facts for the purposes of orienting the reader.[2] West Havens Avenue runs east-west and parallels Interstate 90 ("I-90") approximately 3/4 mile north of the interstate. South Ohlman Street runs north-south and is perpendicular to I-90. Where South Ohlman Street intersects with I-90 there are exit- and entrance-ramps giving access to the interstate at Exit 330. The Ohlman-I-90 intersection is directly

---

[1] The annual motorcycle rally in Sturgis, South Dakota, draws hundreds of thousands of motorcyclists to South Dakota from all over the nation and the world. In 2021, the South Dakota Department of Transportation estimated 525,000 visitors attended the rally. See *2021 Sturgis Rally Final Vehicle Counts*, S.D. DEP'T OF TRANSP., https://perma.cc/FYQ5-Q5Q9 (last visited Apr. 3, 2024).

[2] See FED. R. EVID. 201(b) (court may take judicial notice of a fact that is not subject to reasonable dispute because it is generally known within the court's territorial jurisdiction or because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned). The court did not give prior notice to the parties of its intent to take judicial notice. If any party objects to such judicial notice being taken by the undersigned, they should immediately contact the court and a hearing will be set so that the party's objection may be heard. See FED. R. EVID. 201(e).

south of the Ohlman-Havens intersection. The area is generally near the southwest boundary of the city of Mitchell.

At the intersection, West Havens Avenue has lanes going west, lanes going east, and a left-turn lane in the middle. See Ex. 2. South Ohlman Street has lanes for northbound traffic, two lanes for southbound traffic, and a left-turn lane in the middle. Id. There is a Shell gasoline station on the northeast corner of the intersection. Id.

When Trooper Monger finished his phone call, he pulled out onto West Havens Avenue and began traveling west, toward the intersection with South Ohlman. Ex. 1 at 00:00 to 00:20. At the intersection, two motorcycles, driven by Mr. Rodriguez and another individual, were stopped in the left-turn lane perpendicular to the flow of traffic in that lane, and facing south. Id. at 00:20 to 00:24.

Trooper Monger testified both motorcyclists were wearing vests with Hells Angels motorcycle club insignias on them. Trooper Monger testified that his training and personal experience informed him that members of the Hells Angels club were typically involved in criminal activity and known to carry knives, guns, and other weapons.

When the left turn signal for the turning lane on Havens turned green, the two motorcycles pulled forward (south) into the lanes of traffic designated for eastbound traffic on Havens, and then traveled in those eastbound lanes going west. Id. at 00:24 to 00:32. The two motorcycles then negotiated their left turn to the south from those eastbound lanes. Id. at 00:33 to 00:38. As

they did so, they swung wide into the westernmost (far right) lane of South Ohlman, now traveling south in that outside lane, heading toward I-90. Id. The two motorcycles traveled abreast of each other through the turn. Id.

Trooper Monger testified he decided to conduct a traffic stop when the left turn arrow turned green based upon his belief the motorcycles had violated three traffic laws: improper placement in the turning lane, failure to signal the turn, and driving on the wrong side of the road. Three days after the traffic stop, on August 5, 2021, Trooper Monger wrote a written report detailing the events of August 2. In that report, Trooper Monger did not note that the motorcyclists failed to signal their turn and did not note that the motorcyclists made a wide left turn (did not turn into the innermost southbound lane of Ohlman). At the evidentiary hearing, Trooper Monger testified he definitely observed the wide left turn on the day of the incident and that event formed part of the reasonable suspicion in support of his decision to stop the two motorcyclists. However, Trooper Monger testified he did not notice the failure to signal the turn until he later watched the video of the traffic stop.

Trooper Monger testified that troopers are instructed to call into dispatch and announce whenever they are stopping any motorist who is a member of a motorcycle club. The purpose of the call-in requirement is so that other officers can come to the location of the traffic stop as back-up.

Trooper Monger activated his lights to initiate a traffic stop of the two motorcycles; he testified he believed he did so in the midst of turning left onto

Ohlman Street.[3]  Trooper Monger testified he did not believe he activated his siren.  The second motorcycle yielded in response to Trooper Monger's lights, but Mr. Rodriguez accelerated away from Trooper Monger at a high rate of speed, much faster than the other vehicles on Ohlman Street.  Id. at 00:47 to 00:56.  While traveling away from Trooper Monger at a high rate of speed, Mr. Rodriguez passed a white SUV and cut that SUV off, zipping back into the rightmost lane right in front of the SUV.  Id.

Trooper Monger testified he estimated Mr. Rodriguez's speed to be 65 to 70 miles per hour.  The speed limit on that stretch of road was 45 miles per hour.  Trooper Monger testified that he has received specialized training in estimating speeds of vehicles by observing them as part of his radar certification training.  Over the nine years Trooper Monger has been a highway patrolman, he has taken radar certification training, which requires that he be able to estimate the speed of approximately 20 vehicles within five miles per hour of their actual speed.  The training also requires him to estimate a vehicle's speed within 5 miles of accuracy before activating his radar gun.  Only if the radar gun readout and the trooper's estimate are within 5 miles of each other is the readout determined to be valid.  In addition to the initial radar certification training, Trooper Monger has undergone recertification in estimating speeds of vehicles every two to three years.

---

[3] Exhibit 1 does not indicate at what point Trooper Monger's lights were activated.

Trooper Monger has also been training on estimating another vehicle's speed by pacing it with his patrol vehicle, which has a certified speedometer so that it is a true and accurate reflection of exact speeds. When estimating a target vehicle's speed, Trooper Monger uses his eyes, the speed on his own speedometer, and the speed of surrounding traffic, which he assumes is traveling at or below the posted speed limit.

In addition to Trooper Monger's testimony, the court makes its own finding of fact about Mr. Rodriguez's speed based on Exhibit 1. On Exhibit 1, Mr. Rodriguez's motorcycle goes from being very close in front of the trooper's patrol vehicle, to being a tiny dot in the distance in 15 seconds. Ex. 1 at 00:40 to 00:55. The sound of Mr. Rodriguez's motorcycle engine accelerating can be heard above the din of the regular traffic. Id. There are several other vehicles on the road in the camera frame and Mr. Rodriguez is clearly traveling at a much greater speed than any other vehicle that can be seen. Id. From these observations the court concludes independent of Trooper Monger's testimony that Mr. Rodriguez was traveling above the speed limit during the time shown on Exhibit 1.

On the day of the traffic stop, Trooper Monger said he disregarded Mr. Rodriguez's companion, who yielded to the trooper's lights, and pursued Mr. Rodriguez, because he believed him to be attempting to flee. Ex. 1 at 00:56 to 1:15. Trooper Monger admitted on cross-examination that sometimes it takes a while for motorists to notice that he has activated his lights when attempting to pull them over. Nevertheless, Trooper Monger persisted in his

testimony that he believed Mr. Rodriguez was attempting to flee. He based this assertion on the fact that: (1) Mr. Rodriguez's companion saw the lights and pulled over, (2) typically when motorcyclists are traveling together and one motorcycle pulls over, the companion motorcyclists also pull over, (3) Mr. Rodriguez and his companion were traveling side by side when Trooper Monger activated his lights, and (4) Mr. Rodriguez began to travel at an excessive speed after Trooper Monger activated his lights.

Mr. Rodriguez initially turned right (west) onto the I-90 onramp, but then made a U-turn on the ramp and came to a stop, facing east (the wrong way) on the ramp. Id. at 1:15 to 1:21. Trooper Anderson also responded to the scene of the stop and can be seen in Exhibit 1, but Trooper Anderson did not testify.

There is no audio of the conversation between Mr. Rodriguez and the troopers at the stop. Trooper Monger testified that his microphone was fastened to his belt and had an exposed mute button at the bottom that was inadvertently activated. He testified he assumed his mic was inadvertently muted on the day of the stop of Mr. Rodriguez and that was why there was no audio for the video recording.

Prior to the Sturgis Motorcycle Rally each year, Trooper Monger testified he and other law enforcement officers receive specialized training regarding outlaw motorcycle clubs. This training informs officers of trends and developments regarding these clubs from the Outlaw Motorcycle Club Task Force. In addition, the Fusion Center sends out periodic bulletins about

motorcycle clubs. Finally, Trooper Monger testified he had personal knowledge and experience about motorcycle clubs because he had performed many traffic stops regarding members of such clubs.

Based on this information, Trooper Monger testified that it is common for members of the Hells Angels motorcycle club to be armed. They are known to carry knives and other improvised weapons such as chains and hammers.

When Mr. Rodriguez stopped his motorcycle on the interstate onramp, he got off the cycle. Ex. 1 at 1:47. Trooper Monger advised him why he was being stopped (multiple traffic violations) and asked for his driver's license, registration, and insurance. Mr. Rodriguez retrieved these documents from his saddle bag and gave them to Trooper Monger. Id. at 2:54. He also removed his motorcycle helmet at Trooper Monger's request. Id. at 3:11.

Within 30 seconds, Trooper Monger can be seen reaching into the area of Mr. Rodriguez's waist and removing an object. Id. at 3:40. Trooper Monger testified that he observed a large bulge in the front of Mr. Rodriguez's waistband and asked what it was. Mr. Rodriguez stated it was a knife. Trooper Monger removed the knife from Mr. Rodriguez without asking permission to do so.[4] He then patted Mr. Rodriguez down over the top of his clothing to search for other weapons. He felt a bulge near Mr. Rodriguez's

---

[4] No evidence was given as to a description of the knife found on Mr. Rodriguez. Mr. Rodriguez's vest was black as was his t-shirt. The video introduced (both Ex. 1 & Ex. B) is far enough away and of poor enough quality that the court could not discern any description of the knife. In addition, Trooper Monger's body is between the knife and the camera for part of the time, blocking a clear view of the knife. Once removed, the knife was placed out of the view of the camera.

waistline and discovered a Smith & Wesson 9mm pistol, the illegal possession of which Mr. Rodriguez is now charged with.

Trooper Monger ran the serial number for the pistol through NCIC and discovered the gun was reported stolen. Mr. Rodriguez was then placed under arrest, handcuffed and his motorcycle searched after discovery of the pistol. In that search, a gun holster was discovered along with a body armor vest.

Mr. Rodriguez now moves to suppress the fruits of the search of his person and his motorcycle, arguing there was no reasonable basis for the traffic stop and no legal basis for the pat search of his person or the search of his motorcycle. Docket No. 33. The government argues police observed Mr. Rodriguez violate several traffic laws, thus justifying the traffic stop. Docket No. 35 at p. 4. The government also asserts police acted lawfully in patting Mr. Rodriguez down; when that pat search turned up a firearm, the government argues the police had probable cause to search Mr. Rodriguez's motorcycle under the automobile exception. Id. at pp. 8-11.

## DISCUSSION

A.  **Whether there was Probable Cause or Reasonable Suspicion to Initiate the Traffic Stop**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. A "seizure" occurs when a reasonable person understands "that he [is] not at liberty to ignore the police . . . and go about his business." Michigan v. Chesternut, 486 U.S. 567, 569 (1988). Traffic stops are a type of seizure. United States v. Sanchez, 955 F.3d 669, 674

9

(8th Cir. 2020) (citation omitted).  And so, on the Fourth Amendment's terms, a traffic stop must be reasonable.  See United States v. Martinez, 358 F.3d 1005, 1009 (8th Cir. 2004).

"[A] traffic stop is reasonable if it is supported by either probable cause or an articulable and reasonable suspicion that a traffic violation has occurred."  United States v. Green, 946 F.3d 433, 438 (8th Cir. 2019) (citation omitted).  When a police officer observes a traffic violation, no matter how minor, probable cause exists to initiate a stop.  United States v. Mendoza, 677 F.3d 822, 827 (8th Cir. 2012).

When probable cause is challenged, it is the government's burden to establish its existence.  United States v. $45,000.00 in U.S. Currency, 749 F.3d 709, 716 (8th Cir. 2014) (citation omitted).  The credible testimony of an officer as to his observations of a traffic violation is all that is required to satisfy that burden.  Cf. Mendoza, 677 F.3d at 828.

Here, Trooper Monger observed Mr. Rodriguez commit multiple traffic violations, only one of which would be sufficient to support the traffic stop.  Mr. Rodriguez's motorcycle was stopped in the turning lane perpendicular to the flow of traffic; when the left turn signal turned green, he drove into the oncoming traffic lane and made his left turn from that wrong lane of travel, and he turned directly into the outermost lane instead of the innermost lane as he should have.  These driving actions by Mr. Rodriguez violated SDCL § 32-26-18 (keep to one's lane of traffic when turning left), and SDCL § 32-26-18.1 (must be in a proper position upon the roadway before turning at an intersection).

Therefore, these driving actions by Mr. Rodriguez gave Trooper Monger probable cause to conduct a stop of him.

In addition, Mr. Rodriguez was cited for careless driving, Docket No. 34 at p. 2, which involves driving a vehicle upon a highway without due caution at a speed or in a manner that endangers persons or property. SDCL § 32-24-8. When Trooper Monger observed Mr. Rodriguez cross several lanes of traffic in order to negotiate his left-hand turn in the wrong lane of travel, then increase his speed to 65 or 70 miles per hour in a 45-mile-per-hour zone (again with other vehicles and persons present), and drive in such a way that he cut off the white SUV he passed, this gave Trooper Monger reasonable suspicion or probable cause to believe Mr. Rodriguez had violated South Dakota's careless driving statute. See State v. Tammi, 520 N.W.2d 619, 620-23 (S.D. 1994) (describing facts which supported a careless driving charge). The court concludes that there was probable cause to conduct a traffic stop of Mr. Rodriguez on the additional basis of careless driving.

Mr. Rodriguez notes that, although he was initially issued a traffic ticket for careless driving, that ticket was later dismissed. Docket No. 34 at p. 3. This, he argues, demonstrates that there really never was a traffic violation in the first instance in support of the stop. Id. Furthermore, Trooper Monger only estimated Mr. Rodriguez's speed to be 65 to 70 miles per hour. Id. Mr. Rodriguez argues that because the trooper never documented his speed using a radar gun and never issued a traffic ticket for speeding, this vitiates any reasonable basis for the stop. Id.

11

The court rejects these arguments. First of all, Mr. Rodriguez makes no showing that the careless driving ticket was dismissed on the merits by the state court. The fact that a lesser charge is dismissed without prejudice in favor of more serious charges does not compel the conclusion that the traffic stop was lacking in probable cause or reasonable suspicion. See Hawthorne by Hawthorne v. County of Putnam, 492 F. Supp. 3d 281, 295-96 (S.D.N.Y. 2020); see also Elkins v. United States, 364 U.S. 206, 224 (1960) (holding that "whether there has been an unreasonable search and seizure by state officers, a federal court must make an independent inquiry, whether or not there has been such an inquiry by a state court, and irrespective of how any such inquiry may have turned out. The test is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed."); United States v. Redwood, No. 16 CR 80, 2016 WL 3345546, at *3 (N.D. Ill. June 16, 2016) (holding that state court dismissal of charges was immaterial to question in federal court whether defendant's Fourth Amendment rights were violated); Lange v. City of Grand Junction, Civil Case No. 08-cv-02049-LTB-MJW, 2009 WL 973502, at *4 (D. Colo. Apr. 10, 2009) (subsequent dismissal by state court of traffic ticket was immaterial to inquiry in federal court whether the traffic stop violated the Fourth Amendment). As the court has already concluded above, Trooper Monger observed Mr. Rodriguez violate the careless driving statute and this gave Trooper Monger probable cause to stop Mr. Rodriguez.

The fact that Trooper Monger did not capture Mr. Rodriguez's speed with a radar gun or issue him a speeding ticket is irrelevant. The test when a traffic stop based on a visual estimate of speed is supported by reasonable suspicion or probable cause is whether, under the totality of circumstances, the trooper's stop was reasonable. United States v. Gaffney, 789 F.3d 866, 869 (8th Cir. 2015). Here, Trooper Monger had reliable evidence that Mr. Rodriguez was speeding. He is familiar with this area and often patrols here. He has received specialized training and certification in visually estimating speeds. The stop occurred in broad daylight with good visibility. Mr. Rodriguez's speed was noticeably faster than surrounding vehicles traveling the same road under the same speed limit. The video of the stop (Ex. 1) clearly shows that Mr. Rodriguez was speeding and corroborates Trooper Monger's visual estimate of speed. The court concludes that, considering the totality of circumstances, Trooper Monger's stop based in part[5] on his visual estimate that Mr. Rodriguez was speeding, was a reasonable stop.

Finally, the fact that Trooper Monger did not issue a speeding ticket to Mr. Rodriguez does not impact the analysis of whether there was reasonable suspicion or probable cause for the stop. Careless driving, the crime for which Trooper Monger *did* issue a ticket, includes within its description the concept of carelessness due to speed: "Any person who drives any vehicle upon a highway . . . carelessly and without due caution, ***at a speed*** or in a manner so

---

[5] The stop was not based solely on Mr. Rodriguez speeding, but on all the traffic violations observed by Trooper Monger as discussed previously.

as to endanger any person or property, not amounting to reckless driving . . . is guilty of careless driving." See SDCL § 32-24-8 (emphasis added). Thus, the careless driving ticket did assert a criminal charge against Mr. Rodriguez based at least in part upon his speed. An additional and separate ticket for speeding alone would have been superfluous and is not required to satisfy the Fourth Amendment.

Based on the totality of circumstances presented by the facts in this case, this court concludes there was probable cause for Trooper Monger to conduct a traffic stop on Mr. Rodriguez.

**B.    Whether Trooper Monger had Reasonable Suspicion to Conduct a Pat-Down Search of Mr. Rodriguez**

Mr. Rodriguez argues that Trooper Monger unlawfully conducted the pat-down search of his person. Docket No. 34 at p. 4. Under the Fourth Amendment, citizens have the right "to be free from unreasonable governmental intrusion" on to their persons. Terry v. Ohio, 392 U.S. 1, 9 (1968). In the case of a man walking down the street, Terry v. Ohio instructs that an officer's seizure of that man is valid if the officer has "reasonable and articulable suspicion that criminal activity may be afoot." United States v. Navarette-Brown, 192 F.3d 786, 790 (8th Cir. 1999) (citing Terry, 392 U.S. at 25–31). Should a valid seizure initiate, the seizing officer may "take any additional steps that are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." Id. (citing United States v. Hensley, 469 U.S. 221, 235 (1985)). Where the officer has a reasonable, articulable suspicion that the suspect is armed and dangerous, one

14

of those steps may be to "conduct a limited pat-down search of the individual's outer clothing for the purpose of uncovering concealed weapons." United States v. Gilliam, 520 F.3d 844, 848 (8th Cir. 2008).

In the context of a traffic stop, the first prong of the Terry analysis—the question of whether criminal activity may be afoot—is satisfied so long as the seizing officer has probable cause or reasonable suspicion that a traffic violation has occurred. Arizona v. Johnson, 555 U.S. 323, 327 (2009). So, should the seizing officer have reasonable suspicion that the seized driver is armed and dangerous, the officer may conduct a safety pat-down of that driver. Id.

Whether an officer's suspicion is reasonable depends on "the totality of the circumstances in light of the officers' experience and specialized training." United States v. Williams, 39 F.4th 1034, 1042 (8th Cir. 2022) (citation omitted). Factors that help inform the inquiry include time of day, United States v. Roggeman, 279 F.3d 573, 578 (8th Cir. 2002), whether the stop was conducted in a high-crime area, United States v. Stewart, 631 F.3d 453, 458 (8th Cir. 2011), and the criminal history and gang affiliation of the occupants. United States v. Roelandt, 827 F.3d 746, 748–49 (8th Cir. 2016) (citing Stewart, 631 F.3d at 457–58).

In United States v. Horton, 611 F.3d 936, 940-41 (8th Cir. 2010), the court approved a pat-down search of a legally stopped suspect because the police had information that the suspect may be carrying a knife. Here, Trooper Monger did not have second-hand information about Mr. Rodriguez being

15

armed with a knife (like the police in Horton); instead, he saw it with his own eyes, and the presence of the knife was confirmed by Mr. Rodriguez himself. Under these circumstances, Trooper Monger was justified in patting Mr. Rodriguez down to assure himself there were no other weapons on his person. Id.; see also Pennsylvania v. Mimms, 434 U.S. 106, 108-12 (1977) (*per curiam*) (police were justified in ordering suspect out of vehicle at a lawful traffic stop and, upon seeing a large bulge under the suspect's sports jacket, were justified in conducting a Terry pat search of the suspect).

But Trooper Monger's basis for the pat-down of Mr. Rodriguez did not rest on the presence of the knife alone. There were many other facts known to Trooper Monger that gave rise to reasonable suspicion to believe Mr. Rodriguez may be armed and dangerous. Through training and experience, Trooper Monger testified that he knows that members of the Hells Angels motorcycle club are often armed with knives and other improvised weapons such as chains and hammers. The finding of one such weapon confirmed the generalized information about Hells Angels members and justified a further pat-down search to make sure there were not additional weapons.

In addition, Mr. Rodriguez's driving behavior after Trooper Monger activated his lights led the trooper to believe Mr. Rodriguez might have been attempting to flee, further heightening his suspicions. Although Trooper Monger testified that sometimes it takes a while for motorists to notice that the trooper is attempting to pull them over, here Mr. Rodriguez's motorcycle companion noticed and yielded. Furthermore, Mr. Rodriguez's extreme

acceleration away from Trooper Monger for approximately 3/4 mile gave the trooper a reasonable basis to think the suspect was attempting to flee. The court finds that Trooper Monger's pat-down search of Mr. Rodriguez was supported by reasonable suspicion.

## C.     The Search of Mr. Rodriguez's Motorcycle

The only argument Mr. Rodriguez makes in favor of suppression of the fruits of the search of his motorcycle is that the precedent traffic stop, and pat-down search violated the Fourth Amendment and, therefore, the search of the motorcycle must be suppressed as fruit of the poisonous tree. Docket No. 34 at p. 5. Because the court has found no Fourth Amendment violation in either the traffic stop or the pat-down search, any evidence discovered during the search of the motorcycle is not fruit of an earlier constitutional violation. The court accordingly recommends denying Mr. Rodriguez's motion to suppress the evidence discovered in the search of his motorcycle.

## CONCLUSION

Based on the foregoing facts, law and analysis, this magistrate judge respectfully recommends denying Mr. Rodriguez's motion to suppress [Docket No. 33] in its entirety. The traffic stop of Mr. Rodriguez did not violate the Fourth Amendment and neither did either of the subsequent searches of his person or his motorcycle.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1),

unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the district court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

    DATED this 8th day of April, 2024.

                                BY THE COURT:

                                VERONICA L. DUFFY
                                United States Magistrate Judge